**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| TUWANNA CARMOUCHE, individually, and on behalf of all others similarly situated, | ) | |
| Plaintiff, | ) | Case No. 2:21-cv-02557-JPM-atc |
| vs. | ) | CLASS ACTION COMPLAINT |
| A1 DIABETES & MEDICAL SUPPLY, INC., | ) | JURY DEMAND |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS AND/OR STRIKE CLASS ALLEGATIONS WITH PREJUDICE**

Defendant A1 Diabetes & Medical Supply, Inc. ("A1"), by and through undersigned counsel, pursuant to Rules 12 and 23 of the Federal Rules of Civil Procedure, hereby files this Memorandum of Law in Support of its Motion to Dismiss and/or to Strike Class Allegations and Claims with Prejudice. In support of this Motion, A1 states as follows:

## INTRODUCTION

Plaintiff Tuwanna Carmouche ("Plaintiff") has filed a putative Class Action Complaint and Demand for Jury Trial ("Complaint") against A1 based on alleged violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. *See generally* Complaint. As explained in detail below, Plaintiff's TCPA claim fails to state a claim upon which relief can be granted because A1's alleged calls fall within the "emergency purposes" exception of the statute and therefore are not subject to the TCPA. Furthermore, Plaintiff's class allegations and claims fail to satisfy the requirements for class certification under Rule 23.

## ALLEGATIONS OF COMPLAINT

A1 is a medical services company that "provide[s] beneficiaries or their doctors with medical equipment" in connection with Medicare and in exchange for government reimbursements. *A1 Diabetes & Medical Supply, Inc. v. Azar*, 937 F.3d 613, 615 (6th Cir. 2019). According to the allegations of the Complaint, Plaintiff is a Louisiana resident who is the "regular and sole user" of a "cellular telephone number—(318) XXX-6221." (ECF No. 1 at ¶¶ 5, 7.) "Sometime in the past four years," Al allegedly "began placing calls and delivering artificial or prerecorded voice messages to Plaintiff's cellular telephone number." (*Id.* at ¶ 9.) These messages were "delivered to Plaintiff's cellular telephone" in the form of "artificial or prerecorded voice messages." (*Id.* at ¶ 18.)

As their content plainly indicates, the voicemail messages[1] are intended for customers with whom A1 has an established business relationship and who are being contacted to "refill" and "reorder" supplies. (*Id.* at ¶¶ 18-19.) The messages provide customers with the telephone number for A1's "automated reorder system." (*Id.*) They also inform customers that they can "refill online at A1diabetes.com/refill." (*Id.* at ¶ 18.) That link takes customers to a webpage titled "Reorder Supplies" where customers input their information, including an existing "Customer #," and select "the type of reorder" for "Diabetic Testing Supplies," as well as other

---

[1] It is evident from the allegations in the Complaint that Plaintiff's alleged TCPA claim, both individually and on behalf of the putative classes, is based solely on voicemail messages left on a recipient's cell phone. Plaintiff alleges that she answered A1's calls on several occasions, spoke to a live representative, and informed that representative that "she was not diabetic" and that A1 had "reached a wrong number, and that it should stop placing calls and delivering messages to her cellular telephone." (ECF No. 1 at ¶¶ 11, 13-15.) Notably, Plaintiff does not allege that an artificial or prerecorded voice was delivered on the calls which she answered. (*Compare id.* at ¶¶ 11, 13-15 *with id.* at ¶ 18.) Plaintiff only alleges that "voicemail artificial or prerecorded voice messages" were delivered "[o]n occasions when Plaintiff did not answer Defendant's calls . . ." (*Id.* at ¶ 18.)

supplies like "Insulin Pump Supplies," "Catheter Supplies," and "Ostomy Supplies." (*Id.* [2]) By completing the reordering boxes, customers give permission to be contacted "by autodialed calls and/or prerecorded messages" and certify they "have less than 10 days of supplies remaining (with zero supplies on hand) . . . ." (*Id.*)

Plaintiff alleges that, after receiving these voice messages, she called A1 and asked them to stop. She asserts that she is not a customer of A1, has no business relationship with A1, and did not provide A1 with her telephone number or otherwise give A1 prior express consent to place calls with an artificial or prerecorded voice. (*Id.* at ¶¶ 26-29.) Plaintiff asserts that she continued to receive voicemails despite these requests. (*Id.* at ¶¶ 23-24.)

Based on these allegations, Plaintiff seeks to represent two nationwide classes. (*Id.* at ¶ 36.) The proposed class definitions include "[a]ll persons and entities throughout the United States" who meet the following definitions.

> A. (1) to whom A1 . . . placed, or caused to be placed, a call directed to a number assigned to a cellular telephone service, but not assigned to an A1 . . . customer, (2) by using an artificial or prerecorded voice, (3) from four years preceding the date of th[e] [Complaint] through the date of class certification; OR
>
> B. (1) to whom A1 . . . placed or caused to be placed, a call directed to a number assigned to a cellular telephone service, (2) by using an artificial or prerecorded voice, (3) after the called party informed A1 . . . that the telephone number it called was a wrong or reassigned number, or instructed A1 . . . to stop placing calls to the number, (4) from four years preceding the date of th[e] [Complaint] through the date of class certification.

(*Id.* at ¶ 36.) As explained herein, Plaintiff's individual claim should be dismissed with

---

[2] Because the "website is incorporated by reference in the Complaint," the Court "may consider the website" under Fed. R. Civ. P. 12. *Orozco v. Fresh Direct LLC*, No. 15-CV-8226, 2016 WL 5416510, at *5 (S.D.N.Y. Sept. 27, 2016); *see also A.G. by and Through N.G. v. Community Insurance Company*, 363 F. Supp. 3d 834, 839 n.2 (S.D. Ohio 2019) ("The complaint refers to the Blue Ridge website. Because it is referred to in the Complaint and is central to Plaintiff's claim . . ., the Court may properly consider the Blue Ridge website exhibits that Anthem attaches to the motion to dismiss.").

prejudice under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, and Plaintiff's class allegations and claims should be stricken for failure to satisfy the requirements for class certification under Rule 23.

**ARGUMENT**

**A. Standard of Review for a Motion to Dismiss and to Strike Class Allegations.**

**1. Standard for Motion to Dismiss.**

To survive a motion to dismiss, a complaint "must contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 275-76 (6th Cir. 2010) (quoting *Tam Travel, Inc. v. Delta Airlines, Inc.*, 583 F.3d 896, 903 (6th Cir. 2009)) (internal quotation marks omitted). In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the U.S. Supreme Court held that a complaint need not contain detailed factual allegations, but the plaintiff must provide grounds for entitlement to relief, and this "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "The key inquiry is whether the facts in the complaint set out 'a claim to relief that is plausible on its face.'" *Whitney v. City of Milan*, No. 1:09-cv-1127, 2010 WL 2671718, at *2 (W.D. Tenn. July 6, 2010) (quoting *Twombly*, 550 U.S. at 570); *see also Smith v. Breen*, No. 1:09-cv-2770, 2010 WL 2557447, at *5 (W.D. Tenn. June 21, 2010) ("Factual allegations must be enough to raise a right to relief above the speculative level . . . .").

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court clarified that the analysis under Rule 12(b)(6) requires a two-pronged approach. First, the court should determine which allegations in the complaint can be classified as "legal conclusions" and disregard them for purposes of deciding the motion. *Id.* at 678. "Threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice." *Id.* (emphasis added). Second, the court should evaluate the remaining portions of the complaint – in other words, the well-pleaded facts – and ascertain whether they give rise to a "plausible suggestion" of a claim. *Id.* at 680. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting FED. R. CIV. P. 8(a)(2)); *see also Baptist v. Bank of New York Mellon*, No. 09-2569-STA, 2010 WL 1539973, at *4 (W.D. Tenn. Apr. 16, 2010) (granting a motion to dismiss and holding that the complaint "fail[ed] to comply with the Federal Rules of Civil Procedure and the plausibility pleading standard announced in *Twombly* and *Iqbal*").

**2. Standard for Motion to Strike Class Allegations.**

Rule 23 provides that the Court "[a]t an early practicable time . . . must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A); *see also* Fed. R. Civ. P. 23(d)(1)(D) (allowing courts to issue orders to eliminate allegations about representation of absent persons). A motion to strike class allegations is an appropriate mechanism[3] to determine whether a case may proceed as a class action, and such a motion may be granted prior to discovery or the filing of a motion for class certification by a plaintiff. *See Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 946-49 (6th Cir. 2011) (affirming the district court's striking of class allegations before discovery or motion for class certification); *Sauter v. CVS Pharmacy, Inc.*, NO. 2:13-cv-846, 2014 WL 1814076, *8 (S.D. Ohio May 7, 2014) ("Courts in the Sixth Circuit have permitted the use of motions to strike class allegations

[3] Rule 12(f) is the "procedural vehicle for striking class allegations," as it permits the Court to strike "'any redundant, immaterial, impertinent or scandalous matter' to avoid wasting 'time and money litigating spurious issues.'" *Eldridge v. Cabela's Inc.*, No. 3:16-cv-536-DJH, 2017 WL 4364205, at *8 (W.D. Ky. Sept. 29, 2017) (quoting Fed. R. Civ. P. 12(f)).

prior to discovery."). "Striking deficient class allegations comports with Rule 23's directive that courts determine whether a class may be certified '[a]t an early practicable time.'" *Smith v. Cash America Int'l, Inc.*, No. 1:15-CV-00760-MRB, 2019 WL 2352921, at *2 (S.D. Ohio June 4, 2019).

"[R]ejecting class certification at the pleadings stage is proper" when the Court can conclude from the pleadings that the putative class cannot be certified. *Hill v. Wells Fargo Bank, N.A.*, 946 F. Supp. 2d 817, 829 (N.D. Ill. 2013); *see also Smith*, 2019 WL 2352921, at *2 ("[A] Court may strike class allegations. . . where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met."); *Nevada-Martinez v. Ahmad*, No. 5:15-cv-239, 2016 WL 7888046, at *3 (E.D. Ky. June 17, 2016) (granting motion to strike where "the class allegations in the [complaint] are facially and inherently defective to establish a class action"). "When the defendant challenges class certification based solely on the allegations of the complaint, the standard is the same as applied in deciding a motion to dismiss under Rule 12(b)(6)." *Oom v. Michaels Companies, Inc.*, No. 1:16-cv-257, 2017 WL 3048540, at *3 (W.D. Mich. Jul. 19, 2017). "As such, the complaint must contain 'factual allegations . . . enough to raise a right to [class certification] above the speculative level . . . on the assumption that all the allegations in the complaint are true.'" *Id.* (quoting *Bell Alt. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (brackets in original)). "The moving party has the burden on demonstrating from the face of the plaintiff's complaint that it will be impossible to certify the class as alleged, regardless of the facts plaintiff may be able to prove." *Eldridge v. Cabela's Inc.*, No. 3:16-cv-536-DJH, 2017 WL 4364205, at *7 (W.D. Ky. Sept. 29, 2017) (citation omitted).

"[W]hen the class-action issue is before a court on a motion to strike, the central question is whether the Rule 23 prerequisites are met." *Id.* at *8. Thus, in determining whether to strike

class allegations, the Court should consider whether Plaintiff's allegations satisfy all four requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Pilgrim*, 660 F.3d at 945. Plaintiff must also satisfy "the prerequisites of one of the three types of class actions provided for by Rule 23(b)." *Id.* at 945-46. "[I]f the plaintiff will be unable to establish even one of the Rule 23 prerequisites, the class allegations must be stricken." *Eldridge*, 2017 WL 4364205, at *7 (emphasis added); *see also Pilgrim*, 660 F.3d at 946 (providing that failure to satisfy the requirements of Rule 23(a) and (b) "dooms the class").

### B. Plaintiff's Complaint should be dismissed because the alleged prerecorded voice messages by A1, which affect the health and safety of consumers, "fall outside the TCPA's consent framework," do not require consent.

Plaintiff asserts a single claim against A1 for violation of 47 U.S.C. § 227(b)(1)(A)(iii) of the TCPA based on A1's alleged use of "an artificial or prerecorded voice in connection with calls it placed to Plaintiff's cellular telephone number." (ECF No. 1 at ¶ 65.) Plaintiff's claim fails as a matter of law because A1's alleged prerecorded voicemails to Plaintiff fall within the emergency purposes exception[4] of the TCPA and therefore "fall outside the TCPA's consent framework." *ACA Int'l v. Federal Communications Commission*, 885 F.3d 687, 714 (D.C. Cir.

[4] To the extent Plaintiff alleges in her Complaint that A1's calls were not made for emergency purposes, (ECF No. 1 at ¶ 30), that allegation is nothing more than a legal conclusion, which is not entitled to the presumption of truth on a motion to dismiss. *See Crawford v. Tilley*, No. 20-6391, 2021 WL 4699442 (6th Cir. Oct. 8, 2021) ("'[A] legal conclusion couched as a factual allegation' is not entitled to a presumption of truth."); *Wigley v. American Equity Mortgage*, No. 15-2473-STA-cgc, 2015 WL 7292562, at *1 n.2 (W.D. Tenn. Nov. 17, 2015). Furthermore, while the emergency purpose exception is an affirmative defense, "[a] motion to dismiss may be premised on an affirmative defense if the plaintiff's own allegations show that a defense exists that legally defeats the claim for relief." *Buckner v. City of Memphis*, No. 2:16-cv-2037-JTF-dkv, 2017 WL 607581, at *3 (W.D. Tenn. Feb. 15, 2017). "Where facts establishing the affirmative defense are apparent on the face of the complaint, a defendant may raise the defense within a motion to dismiss." *Id.*

2018).[5] Accordingly, whether or not A1 had Plaintiff's consent to leave prerecorded voicemails or Plaintiff told A1 to stop calling her is irrelevant. *See id*. ("[C]allers can make them even if recipients are known to object."). Plaintiff's Complaint fails to state a claim and should be dismissed with prejudice.

**1. The "emergency purposes" exception.**

Plaintiff alleges that A1 violated 47 U.S.C. § 227(b)(1)(A)(iii) of the TCPA. (ECF No. 1 at ¶¶ 2, 65.) That provision of the TCPA states in pertinent part:

> It shall be unlawful for any person within the United States . . . to make any call (<u>other than a call made for emergency purposes</u> or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—(iii) to any telephone number assigned to a . . . cellular telephone service . . .

47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added). "Calls or texts made for an emergency purpose . . . are exempt from the TCPA's prior consent requirements." *Gabertan v. Walmart, Inc.*, 523 F. Supp. 3d 1254, 1257 (W.D. Wash. 2021) (citing *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 31 F.C.C. Rcd. 9054, 9062 (2016)); *Dennis v. Amerigroup Washington, Inc*., No. 3:19-cv-05165-RBL, 2020 WL 618472, at *3 (W.D. Wash. Feb. 10, 2020) ("Only emergency calls are exempt from all prior consent requirements."). "[B]y definition, such calls fall outside the TCPA's consent framework; <u>callers can make them even if recipients are known to object</u>." *ACA Int'l*, 885 F.3d at 714 (emphasis added); *Roberts v. Medco Health Solutions, Inc.*, No. 4:15CV1368CDP, 2016 WL 3997071, at *3 (E.D. Mo. July 26, 2016)

---

[5] Although *ACA Int'l* was decided by the D.C. Circuit, the decision is binding in the Sixth Circuit as well. *See Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 467 (6th Cir. 2017) ("Once the Multidistrict Litigation Panel assigned petitions challenging the [FCC rule] to the D.C. Circuit, that court became "the sole forum for addressing ... the validity of the FCC's rule[ ] . . . And consequently, its decision striking down the [FCC rule] became 'binding outside of the [D.C. Circuit].'"); *Ammons v. Ally Financial, Inc.*, 326 F. Supp. 3d 578, 586 n.8 (M.D. Tenn. June 27, 2018).

("Based on the content and purpose of those calls, I conclude that they are all covered by the emergency purposes exemption and so none of them violated the TCPA."). "If the call meets the emergency purposes exception, consent is essentially irrelevant." *Dorfman v. Albertsons, LLC*, No. 1:18-cv-00094-DCN, 2020 WL 86192, at *1 n. 1 (D. Idaho Jan. 7, 2020).

"The emergency purpose exception is to be interpreted broadly." *Gabertan,* 523 F. Supp. 3d at 1257. Indeed, "the legislative history of the TCPA indicates a congressional intent to interpret the term 'emergency' broadly rather than narrowly." *In the Matter of the Tel. Consumer Prot. Act of 1991*, 7 F.C.C. Rcd. 2736, 2738 (1992). "The FCC has defined calls made for an emergency purpose as 'calls made necessary in any situation affecting the health and safety of consumers.'" *Roberts,* 2016 WL 3997071, at *3 (citing 47 C.F.R. § 64.1200). The FCC has "made clear that automated calls to wireless numbers made necessary by incidents of imminent danger including 'health risks' affecting health and safety are made for an emergency purpose and do not require prior express consent to be lawful." *Gabertan*, 523 F. Supp. 3d at 1258 (quoting *In Re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling, 35 FCC Rcd. 2840, 2841 at ¶¶ 5, 6 (2020)).

> <u>Calls like the ones here, involving an attempt to confirm or refill a prescription order, schedule a prescription delivery, or confirm that a prescription is on its way, fall within the ambit of "calls made necessary in any situation affecting the health and safety of consumers."</u>

*Roberts*, 2016 WL 3997071, at *3 (emphasis added). This is so because "a patient's ability to timely receive a prescribed medicine is critical in preventing a major health emergency." *Id.* The emergency purposes exception remains applicable even where calls are made to wrong or reassigned numbers. *See Dennis*, 2020 WL 618472, at *6 ("even wrong-number calls can qualify for the exemption"); *Roberts*, 2016 WL 3997071, at *1. Indeed, the FCC indicated as much in its July 8, 2016 Declaratory Ruling. *See In the Matter of Rules & Regulations*

*Implementing the Tel. Consumer Prot. Act of 1991*, 31 F.C.C. Rcd. at 9062. In that Declaratory Ruling, the FCC stated:

> Even though calls made for an emergency purpose can be made without the prior express consent of the called party, we encourage educational organizations to regularly update their emergency calling lists to ensure that emergency-purpose calls do in fact reach the parent or guardian of each affected student and are not received by consumers with no connection to the school.

*Id*. Had the FCC intended for the emergency purposes exception to be inapplicable to calls to wrong or reassigned numbers, it would have stated so rather than "encourag[ing] . . . organizations to regularly update their emergency calling lists." *Id.*; *see Dennis*, 2020 WL 618472, at *6.

The Sixth Circuit recognized the authority of the FCC with respect to interpretation of the TCPA in *Charvat v. EchoStar Satellite, LLC*:

> Congress vested the FCC with considerable authority to implement the Telephone [Consumer Protection] Act. The Act gives the agency power to "prescribe regulations to implement" the legislation, <u>to exempt calls from the requirements of the Act</u>, to intervene in suits filed by state attorneys general, and to enforce the provisions of the Act and its accompanying regulations. In addition to these lawmaking and law-enforcing powers, the FCC has interpretive authority over the Telephone [Consumer Protection] Act, and its accompanying regulations, including the power to construe the provisions at stake in this case.
>
> The agency also has comparative expertise on the matter. The agency, no surprise, is familiar with the regulations it prescribed, and possesses expertise over the statute it implements, whether that expertise comes in the form of technical experts, agency lawyers or agency staff in a position to obtain input from the relevant stakeholders.

630 F.3d 459, 466-67 (6th Cir. 2010) (citations omitted) (emphasis added). Indeed, the TCPA "is replete with evidence that Congress intended the FCC to promulgate rules carrying the force of law that determine what kinds of prerecorded calls are permissible and what kinds are not." *Leyse v. Clear Channel Broadcasting, Inc.*, 545 Fed. Appx. 444, 453 (6th Cir. 2013) (affirming dismissal of a TCPA lawsuit after finding that prerecorded calls fell within the FCC's regulations

exempting the type of calls at issue).

Just last year in March 2020 during the initial rise of COVID-19, the FCC issued another Declaratory Ruling specifically in regard to the emergency purposes exception when "calls are necessary to protect the health and safety of citizens." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, Declaratory Ruling, 35 FCC Rcd. at 2841, ¶ 6. In its 2020 Declaratory Ruling, the FCC first recognized:

> [T]he COVID-19 pandemic constitutes an 'emergency' under the Telephone Consumer Protection Act (TCPA) and that consequently hospitals, <u>health care providers</u>, state and local health officials, and other government officials may lawfully communicate information about the novel coronavirus <u>as well as mitigation measures without violating federal law</u>.

*Id*. at ¶ 2 (emphasis added). The FCC "confirm[ed] that certain callers may lawfully make automated calls and send automated text messages to wireless telephone numbers when such calls are necessary to protect the health and safety of citizens pursuant to the TCPA's 'emergency purposes' exception." *Id*. The FCC re-emphasized its prior 2016 Declaratory Ruling that "automated calls to wireless numbers made necessary by incidents of imminent danger including 'health risks' affecting health and safety are made for an emergency purpose and do not require prior express consent to be lawful." *Id*. The FCC then stated:

> In determining whether a call relating to the COVID-19 pandemic qualifies as a call made for an emergency purpose, we look to the identity of the caller and content of the call. First, the caller must be from a hospital, or be a health care provider, state or local health official, or other government official as well as a person under the express direction of such an organization and acting on its behalf. Second, the content of the call must be solely informational, made necessary because of the COVID-19 outbreak, and directly related to the imminent health or safety risk arising out of the COVID-19 outbreak.

*Id*. at ¶ 7. As with its 2016 Declaratory Ruling, the FCC made no exception for application of the emergency purpose exception for calls to wrong or reassigned numbers. As discussed in detail below, A1 is a health care provider and its calls are informational and directly related to

the imminent health and safety risk posed from depleted medical supplies, particularly in light of COVID-19. *See Gabertan*, 523 F. Supp. 3d at 1257-61.

### 2. A1's alleged calls to Plaintiff fall squarely within the "emergency purposes" exception.

Because A1 is a healthcare provider and its alleged calls were made for emergency purposes, A1's alleged calls to Plaintiff "are not subject to the TCPA." *Bailey v. CVS Pharmacy, Inc.*, No. 17-11482, 2018 WL 3866701, at *4 (D.N.J. Aug. 14, 2018).

A1 is without question a healthcare provider. "Health care means care, services, or supplies related to the health of an individual." 45 C.F.R. § 160.103.

> Health care includes, but is not limited to, the following:
> (1) Preventive, diagnostic, therapeutic, rehabilitative, maintenance, or palliative care, and counseling, service, assessment, or procedure with respect to the physical or mental condition, or functional status, of an individual or that affects the structure or function of the body; and
> (2) Sale or dispensing of a drug, device, equipment, or other item in accordance with a prescription.

*Id.*; *see also Jackson v. Safeway, Inc.*, Case No. 15-cv-04419-JSC, 2016 WL 5907917 (N.D. Cal. Oct. 11, 2016). A1 is "a medical services company[y] [that] provide[s] beneficiaries or their doctors with medical equipment." *Azar*, 937 F.3d at 615. Specifically, A1 provides its diabetic customers with diabetic testing supplies, insulin pump supplies, catheter supplies, CPAP supplies, ostomy supplies, and TENS unit supplies. (ECF No. 1 at ¶ 18 (citing A1diabetes.com/refill).[6]) A1 allows customers the ability to "refill/resupply" their necessary diabetes[7] equipment when they "have less than 10 days of supplies remaining . . . consistent with

---

[6] *See* Footnote 2.

[7] "Diabetes is the 7th leading cause of death in the United States (and may be underreported)." https://www.cdc.gov/diabetes/basics/quick-facts.html. If diabetes is not properly treated, "[o]ver time, that can cause serious health problems, such as heart disease, vision loss, and kidney disease." https://www.cdc.gov/diabetes/basics/diabetes.html.

my doctor's order." (*Id.*)

In addition to being a healthcare provider, the content of A1's alleged prerecorded voice messages makes clear that the messages are for emergency purposes. As alleged by Plaintiff in her Complaint, A1's message states:

> to confirm your shipment. If it is more convenient, you may refill online at A1diabetes.com/refill. Again, please call us at 855-932-0599 to confirm your shipment. Or you may refill online at A1diabetes.com/refill. Thank you.

(ECF No. 1 at ¶ 18.) A1's message was facially designed to "confirm your shipment" and to notify that supplies may be "refill[ed] online." *Id.*; *cf. Gabertan*, 523 F. Supp. 3d at 1259-60; *Dennis*, 2020 WL 618472, at *2 ("Thank you for choosing Amerigroup Washington as your health plan! Our records show that your Washington Apple Health benefits may need to be renewed… You can also find out the status of your case and get other information online at Washington Apple Health website."). As with the message in *Gabertan*, A1's message provided information about "safe access to prescription medica[l supplies] during the pandemic. The pandemic is a bona fide emergency, and information about how to obtain prescription medica[l supplies] without exposing oneself to COVID-19 is relevant to the public." *Gabertan*, 523 F. Supp. 3d at 1260. "[M]ailing prescriptions - contactless access to prescriptions as part of an effort to mitigate the pandemic's health risks - are facially squarely within the emergency exception as articulated in the [FCC's 2020 Declaratory] Ruling." *Id.* at 1261. Individuals with diabetes are "more likely to get severely ill from COVID-19,"

Furthermore, "[h]aving either type 1 or type 2 diabetes can make you more likely to get severely ill from COVID-19." https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. The Court may take judicial notice of and consider information contained on the CDC's website without converting a motion to dismiss into one for summary judgment. *See Kiser v. Terumo Medical Corporation*, No. 2:21-cv-69, 2021 WL 4356044, at *1 n.2 (E.D. Tenn. Sept. 23, 2021); *CHS/Community Health Systems, Inc. v. Medical University Hospital Authority*, No. 3:20-cv-00163, 2021 WL 964047, at *6 n.6 (M.D. Tenn. Mar. 15, 2021).

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html, thus making A1's "contactless access to [diabetic supplies] as part of an effort to mitigate the pandemic's health risks . . . [fall] squarely within the emergency exception as articulated in the [FCC's 2020 Declaratory] Ruling." *Gabertan*, 523 F. Supp. 3d at 1260.

Even had the COVID-19 pandemic not taken place and not proliferated during the relevant timeframe when Plaintiff allegedly received calls in 2021,[8] "a patient's ability to timely receive [] prescribed medic[al supplies] is critical in preventing a major health emergency." *Roberts*, 2016 WL 3997071, at *3. "The myriad ramifications of a sudden loss of [diabetic supplies] . . . affect a 'consumer's health and safety.'" *Dennis*, 2020 WL 618472, at *7. This is especially the case for diabetics. *See* https://www.cdc.gov/diabetes/managing/flu-sick-days.html ("When your body doesn't have enough insulin, it starts breaking down fat as fuel, which produces ketones. When too many ketones are produced too fast, they can cause diabetic ketoacidosis, or DKA. DKA is very serious and can cause a coma or even death."). Thus, with or without consideration of the COVID-19 pandemic, it is clear that A1's alleged prerecorded messages fit squarely within the emergency purposes exception of the TCPA. *See Roberts*, 2016 WL 3997071, at *3 ("Calls like the ones here, involving an attempt to confirm or refill a prescription order, schedule a prescription delivery, or confirm that a prescription is on its way, fall within the ambit of "calls made necessary in any situation affecting the health and safety of consumers.") (emphasis added). Plaintiff, as a matter of law, cannot state a claim against A1 for violation of 47 U.S.C. § 227(b)(1)(A)(iii).

Finally, to the extent Plaintiff may attempt to rely on *Clair v. CVS Pharmacy, Inc.*, 222 F. Supp. 3d 779 (N.D. Cal. 2016), *Smith v. Rite-Aid Corp.*, No. 17-CV-6044CJS, 2018 WL

---

[8] Plaintiff alleges she received prerecorded messages from A1 from January to March 2021. (ECF No. at ¶ 21.)

5828693 (W.D.N.Y. Nov. 7, 2018), and *Coleman v. Rite Aid of Georgia, Inc.*, 284 F. Supp. 3d 1343 (2018), these cases were decided before *ACA Int'l*, COVID-19, and the FCC's 2020 Declaratory Ruling and are therefore inapposite. *ACA Int'l*, which is controlling, makes clear that "by definition, [emergency purpose] calls fall outside the TCPA's consent framework; callers can make them even if recipients are known to object." 885 F.3d at 714 (emphasis added). Because the emergency purpose exception is applicable and A1's alleged calls "fall outside the TCPA's consent framework," it is irrelevant whether Plaintiff gave A1 consent to call her or told A1 to stop contacting her. *See id*. The TCPA simply cannot and does not provide a basis for Plaintiff to recover against A1 because "calls or texts made for 'an emergency purpose' are excepted from the TCPA." *Gabertan*, 523 F. Supp. 3d at 1258; *Bailey*, 2018 WL 3866701, at *4 ("[C]alls made for 'emergency purposes' are not subject to the TCPA."). Plaintiff's Complaint against A1 should be dismissed with prejudice.

**C. Certification is improper under Rule 23(b)(3) because individualized issues predominate over common questions of law and fact.**

There are individualized issues particular to each putative class member that will result in numerous mini-trials to determine liability and damages to each putative class member. These individualized issues, apparent on the face of Plaintiff's Complaint, clearly outweigh and predominate over any questions of law and fact common to putative class members, thus making class certification improper under Rule 23(b)(3). Rule 23(b)(3) provides in pertinent part:

> A class action may be maintained if Rule 23(a) is satisfied and if: (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3). "To meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those

issues that are subject to only individualized proof." *Nevada-Martinez*, 2016 WL 7888046, at *5. "In discerning whether a putative class meets the predominance inquiry, courts are to assess 'the legal or factual questions that qualify each class member's case as a genuine controversy,' and assess whether those questions are 'subject to generalized proof, and thus applicable to the class as a whole.'" *Sandusky*, 863 F.3d at 468 (citations omitted). "But the key is to 'identify[ ] the substantive issues that will control the outcome," in other words, courts should "consider how a trial on the merits would be conducted if a class were certified.'" *Id*.

Plaintiff cannot meet the predominance requirement under Rule 23(b)(3), and this action should not be permitted to proceed as a class action. The following individualized issues, among others, exist with respect to each putative class member and would have to be evaluated on a case-by-case basis:

1. To the extent the "emergency purposes" exception does not result in dismissal of this case, its applicability to each putative class member requires individualized determinations for each class member.

2. In regard to Class B, reasonable reliance on consent from a prior owner of a phone number is an individualized issue not appropriate for class certification.

3. Whether each class member is entitled to treble damages based on a knowing and willful violation of the TCPA with respect to that particular class member is an individualized issue.

Because predominance fails, all class allegations and claims should be stricken and/or dismissed with prejudice.

**1. To the extent the "emergency purposes" exception does not result in dismissal of this case, its applicability to each putative class member requires individualized inquiries for each class member.**

Should the Court find that Plaintiff's Complaint is not subject to dismissal at this stage based on the emergency purposes exception, the application of the exception nonetheless defeats Plaintiff's ability to certify a class. *See Dorfman*, 2020 WL 86192, at *4-5.

Like Plaintiff in this case, the plaintiff in *Dorfman* filed a putative class action "alleging that its prerecorded artificial voice telephone messages ('robocalls') related to prescription pick-up that it made on behalf of 'Sav- On Pharmacy' ("Sav-on") violated the" TCPA. 2020 WL 86192, at *1. The plaintiff made strikingly similar allegations to Plaintiff in the instant case:

> Dorfman alleges that he received a call from, or on behalf of, Albertsons for him to pick up an "order" that he had never placed at Sav-on. More specifically, he alleges that he: (1) is not a customer of Sav-on; (2) has never given Sav-on consent to call his wireless number; (3) received approximately 21 automated phone calls on his cell phone from Defendant beginning on or around June 12, 2017, regarding a prescription ready for pick-up and belonging to an unknown third party; and (4) has asked Defendant to stop calling him. *Id.* at ¶ 2. Approximately seven calls were received after July 10, 2017, when Dorfman had "asked Defendant to stop calling him."

*Id*. at *2. Albertsons filed a motion to deny class certification, which the district court granted. *Id*. at *6. In granting the motion to deny class certification, the *Dorfman* court explained, "<u>the application of the emergency purposes exception is a fact-specific, individualized question</u>" that would require the Court "to make individualized inquiries into the circumstances and content of wrong number calls that class members received to determine if the messages fell within a TCPA exception." *Id.* at *4 (emphasis added). Furthermore, "for all non-emergency purposes calls, members of the proposed class would need to present evidence that they did not consent to the call. As class members would need to present evidence that varies from member to member, the issue is not susceptible to generalized, class-wide proof." *Id*. *Dorfman* is factually on point to

the instant case; the Court should strike Plaintiff's class allegations for the same reason that the *Dorfman* court granted Albertson's motion to deny class certification—"application of the emergency purposes exception is a fact-specific, individualized question." *Id.* at *4.

**2. In regard to Class B, reasonable reliance on consent from a prior owner of a phone number is an individualized issue not appropriate for class certification.**

Under the TCPA, the use of artificial or prerecorded voice messages is expressly permitted when delivered to cell phones "with the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A)(iii). In a 2015 ruling, the FCC interpreted the "ambiguous" term "'called party' . . . to mean the subscriber to whom the dialed wireless number is assigned . . . along with a non-subscriber customary user" who "due to their relationship to the subscriber, are the number's customary user and can provide prior express consent for the call." 30 F.C.C. Rcd. 7961, 8002. Thus, if a number is "reassigned" to a new subscriber, in most circumstances the prior owner ceases to be the called party. *Id.* Recognizing the inherent difficulty associated with identifying reassigned numbers, the FCC's 2015 decision also established a "one-call safe harbor" for calls made to a reassigned number. *Id.* at 8001 n.265 ("We interpret the TCPA to permit the caller to make or initiate one additional call to a reassigned number . . . where the caller does not have actual knowledge of the reassignment and can show that he had consent to make the call to the previous subscriber or customer user of the number.").

However, in 2018, the Court of Appeals for the D.C. Circuit vacated the one-call safe harbor because the FCC failed "to give some reasoned (and reasonable) explanation of why its safe harbor stopped at the seemingly arbitrary point of a single call or message." *ACA Int'l*, 885 F.3d at 707. Thus, in light of *ACA Int'l*, the issue the Court must now consider in assessing TCPA liability in the context of a reassigned number is whether the "caller's . . . reliance on the

prior subscriber's consent [is] reasonable." *Id.*; *see also Roark v. Credit One Bank, N.A.*, No. 16-173, 2018 WL 5921652, at *3 (D. Minn. Nov. 13, 2018) ("To determine whether there has been a violation of [Section 227(b)(1)(A)] of the TCPA under current authority, the Court must consider the reasonableness of the caller's reliance on a prior number holder's express consent"); *Sandoe v. Boston Scientific Corp.*, No. 18-11826-NMG, 2020 WL 94064, at *4 (D. Mass. Jan. 8, 2020) (finding no TCPA liability for calling reassigned number where defendant "reasonable relied" on "list of current patients who had provided their contact information for health-care related events and services"); *AMP Automotive, LLC v. BFT, LP*, No. 17-5667, 2019 WL 1409769, at *3 (E.D. La. Mar. 28, 2019) (applying "reasonable reliance" standard "to the general inquiry of reassigned numbers").

Here, Class B is based on calls allegedly made to wrong or reassigned numbers. (ECF No. 1 at ¶ 36.) In fact, Plaintiff asserts that one of the common questions pertaining to the class members is A1's conduct "as it pertains to delivering artificial or prerecorded voice messages to wrong or reassigned cellular telephone numbers." (*Id.* at ¶ 54.c.) However, based on the foregoing authorities, and contrary to Plaintiff's assertion, the proposed class implicates the highly individualized issue of whether A1 reasonably relied on consent obtained from a prior owner of the alleged wrong or reassigned number. In other contexts, courts routinely find class certification improper based on the individualized issues necessarily involved in assessing reliance as to multiple putative class members. *See, e.g.*, *Valdez v. Air Line Pilots Ass'n*, No. 2:16-cv-02256-JPM-dkv, 2017 WL 1394638, at *9 n.5 (W.D. Tenn. Jan, 9, 2017) (finding "determination of reliance . . . would necessitate numerous individualized inquiries" and denying class certification); *Phillips v. Philip Morris Companies, Inc.*, 298 F.R.D. 355, 367 (N.D. Ohio 2014) (rejecting class certification of fraud claim because "reliance . . .cannot be determined

class-wide"). To determine the reasonableness of reliance in this case, the Court would need to consider the unique facts and circumstances surrounding each reassigned number, not to mention the individual calls made to those numbers, to determine whether A1 properly relied on a past subscriber's consent. This issue is not appropriate for class certification.

**3. Because treble damages based on a knowing and willful violation of the TCPA are an individualized determination specific to each class member, commonality is lacking.**

In her Complaint, Plaintiff seeks to recover statutory and treble damages on behalf of a nationwide putative class under the TCPA (ECF No. 1 at p. 10.) Even assuming violations of the TCPA occurred as Plaintiff alleges, whether each putative class member is entitled to recover treble damages is an individualized issue not subject to class determination. Therefore, Plaintiff's request for treble damages and all related class allegations should be stricken and/or dismissed with prejudice.

In regard to treble damages, the TCPA provides in pertinent part:

> If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

47 U.S.C. § 227(b)(3). The key to an award of treble damages under the TCPA is the determination of whether a violation of the statute is "willful or knowing." *Id.* "The Sixth Circuit has not articulated what it means for a violation of the TCPA to be 'willful' or 'knowing' . . ." *Kern v. VIP Travel Services*, No: 1:16-CV-8, 2017 WL 4349194, at *2 (W.D. Mich. Oct. 2, 2017). A District Court in Michigan has found that "[i]n order for Plaintiff to prove that Defendants knew that they acted in a manner that violated the statute (regardless if Defendants actually knew that they were violating the statute), Plaintiff must also show that Defendants knew that Plaintiff did not consent to the phone calls." *Harris v. World Financial Network Nat.*

*Bank*, 867 F. Supp. 2d 888, 895 (E.D. Mich. 2012). Whether a violation is willful or knowing will vary by each particular class member based on his/her own interactions and communications with A1 and what Defendant knew with respect to that particular class member. As the District Court for the District of Maryland has recognized:

> Whether Exeter's calling of class members constituted knowing and willful TCPA violations is not a common issue across the class because resolution of that question for a particular class member likely depends on the circumstances surrounding the individual class member's consent, or lack of consent, to receive autodialed calls from Exeter, whether the class member revoked consent, and whether Exeter complied with those instructions.

*Ginwright v. Exeter Finance Corp.*, 280 F. Supp. 3d 674, 687 (D. Md. 2017). Based on the necessity that individualized determinations be made as to each class member, Plaintiff's request for treble damages is not subject to class certification and should be stricken with prejudice.

**D. Plaintiff's proposed classes are fail-safe classes and must be stricken and dismissed.**

Plaintiff's class allegations based on consent and revocation should be stricken and dismissed because it is apparent from the face of the Complaint that they constitute improper fail-safe classes precluded by Rule 23.

In the Sixth Circuit, when a proposed class is defined in such a manner that it "only include[s] those who are entitled to relief," the class "is an improper failsafe class." *Randelman v. Fidelity National Title Ins. Co*., 646 F.3d 347, 352 (6th Cir. 2011); *Lindsay Transmission, LLC*, 2013 WL 275568, at *4. A fail-safe class is inherently deficient because it precludes membership unless the proposed class member can establish liability against the defendant. *See Kissling v. Ohio Cas. Ins. Co.*, No. 5:10–22–JMH, 2010 WL 1978862, at *2 (E.D. Ky. May 14, 2010) (dismissing plaintiff's class allegations). "Either the class members win or, by virtue of losing, they are not in the class and, therefore, not bound by the judgment." *Randleman*, 646 F.3d at 352 (holding that an improper fail-safe class is one that includes only class members that are

entitled to relief"). The Court has the power and authority to strike an improper fail-safe class at the pleadings stage. *See Pilgrim*, 660 F.3d at 946-49 (affirming the district court's the striking of the class allegations before discovery); *Cabela's*, 2017 WL 4364205, at *10 (striking class claims with prejudice as redundant); *Sauter*, 2014 WL 1814076, at *8 (striking a proposed TCPA class because it was a fail-safe and the Sixth Circuit allows for the striking of class allegations prior to discovery).

Federal courts routinely strike TCPA class allegations and claims that incorporate consent into the class definition on the grounds that they amount to fail-safe classes. *See Zarichny v. Complete Payment Recovery Services, Inc.*, No. 14–3197, 2015 WL 249853, at *13 (E.D. Pa. Jan. 21, 2015); *Sauter*, 2014 WL 1814076, at *4-9 (finding that putative TCPA class definitions which included "who did not provide prior express consent for such calls" amounted to a failsafe class definition, granting motion to strike class allegations); *Martinez v. TD Bank USA, N.A.*, No. CV 15-7712(JBS/AMD), 2017 WL 2829601, at *12 (D.N.J. June 30, 2017) (striking plaintiffs' class allegations on the grounds that the proposed class defined as "individuals called without their prior express consent" was a fail-safe class and that "[n]o amount of additional class discovery [would] alter that conclusion"); *Boyer*, 306 F.R.D. at 540 (granting defendant's motion to strike class allegations on the grounds that the proposed putative class definitions constituted fail-safe classes that could not be defined until the case was resolved on the merits); *Lindsay Transmission, LLC*, 2013 WL 275568, at *5 (striking class allegations where the class would solely consist of "persons who can establish that the defendant violated the TCPA," and would require the court to address "the central issue of liability to be decided in the case").

Both Class A and Class B in Plaintiff's Complaint are premised on consent that either never existed or that was revoked and, thus, they constitute impermissible fail-safe classes. Membership in Class A is premised on belonging to a group of persons and entities whose numbers were never assigned to an A1 customer—and thus never gave consent for that number to be called. This is also true for the members of Class B for whom A1 called a wrong or reassigned telephone number. And, Class B's definition of individuals and entities who instructed A1 to stop placing calls to the telephone number is premised on consent and revocation and, thus, constitute an impermissible fail-safe class.

By defining each of these subgroups of the two proposed putative classes to include anyone who received prerecorded calls without prior express consent or who subsequently revoked their consent, Plaintiff's proposed class definitions would necessarily mean that only those with a successful claim against A1 will be a member of those classes. Because Plaintiff's class definitions premised on never having given consent or having revoked consent, they are impermissible fail-safe classes, and they should be stricken and dismissed with prejudice.

**E. Plaintiff cannot certify a class under Rule 23(b)(2) because Plaintiff explicitly seeks individualized monetary relief for class members.**

Plaintiff vaguely seeks certification of a putative class "under Federal Rule of Civil Procedure 23." (Complaint, ¶ 36.) At the outset, based on the Supreme Court's holding in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), Plaintiff cannot certify a class pursuant to Rule 23(b)(2) (which allows for class injunctive and declaratory relief) because Plaintiff seeks individual monetary relief for each putative class member. To the extent that Plaintiff pleads Rule 23 generally in order to conceal her request for certification under Rule 23(b)(2), her class allegations relating to Rule 23(b)(2) should be dismissed and/or stricken with prejudice. *See Progressive Health and Rehab Corp. v. Quinn Medical, Inc.*, 323 F.R.D. 242, 248 (S.D. Ohio

2017). Indeed, in her sole count in the Complaint, Plaintiff seeks no injunctive relief; instead, she merely states that Plaintiff and members of the putative classes are entitled to statutory damages. (ECF No. 1 at ¶ 66.) Only in passing in her Prayer for Relief does Plaintiff mention injunctive relief. Complaint, Prayer for Relief.

The Supreme Court stated in *Dukes*:

> Rule 23(b)(2) allows class treatment when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." . . . [A]t a minimum, claims for individualized relief (like the backpay at issue here) do not satisfy the Rule. . . In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant. Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

*Dukes*, 564 U.S. at 360-61 (emphasis added). "[W]e think it clear that individualized monetary claims belong in Rule 23(b)(3)." *Id*. at 362. Subsequent to *Dukes*, numerous lower courts have held that where a plaintiff in a putative TCPA class action seeks monetary relief, such as in the instant case, the plaintiff cannot certify a class pursuant to Rule 23(b)(2). *See Progressive Health and Rehab Corp*., 332 F.R.D. at 248 ("[T]he TCPA authorizes damages for each violation of the Act. Furthermore, Plaintiff seeks an individualized award of monetary damages—Plaintiffs seek 'actual monetary loss' from violations of the TCPA or 'five hundred dollars ($500.00) for each violation, whichever is greater.' Contrary to Plaintiff's argument, no amount of discovery will show that these monetary damages are incidental to Plaintiff's injunctive claim. If Plaintiffs are ultimately successful, relief would require precisely the type of individualized award of monetary damages that the *Dukes* Court identified as unauthorized under Rule 23(b)(2). Rule 23(b)(2) is therefore not an appropriate vehicle for these claims. . . The Court therefore

GRANTS Defendant's Motion to Strike as it pertains to Plaintiff's allegations sounding in Rule 23(b)(2).") (citations omitted); *Botelho v. Technological Medical Advancements LLC*, No. 2:16-cv-08085-SVW-MRW, 2017 WL 10521412, at *3 (C.D. Cal. 2017) ("Given that each plaintiff is independently entitled to statutory damages under the TCPA, and that Plaintiffs expressly seek 'actual monetary loss from such violations or the sum of five hundred dollars ($500.00) for each violation,' the Court finds certification under Rule 23(b)(2) impermissible."); *Ung v. Universal Acceptance Corporation*, 319 F.R.D. 537, 544 (D. Minn. 2017) ("There can be no doubt here that class members would be entitled to individual monetary awards based on the number of (allegedly) unlawful calls they received from Universal. In addition, where the 'primary relief sought' is monetary rather than injunctive, a Rule 23(b)(2) class cannot be certified. Here, the putative class seeks up to $1,500 in statutory damages for each of several hundred thousand calls—in other words, a potential recovery of hundreds of millions of dollars—strongly suggesting this is a case driven by money, not equitable relief. Indeed, to conclude otherwise would simply be to ignore reality."); *Evans & Green, LLP v. That's Great News, LLC*, No. 11–3340–CV–S–ODS, 2012 WL 4888471, at *4 (W.D. Mo. Oct. 15, 2012) ("Certification under Rule 23(b)(2) is not appropriate where there are claims for monetary relief.").

Under *Dukes*, because Plaintiff seeks monetary relief on behalf of a putative class, Plaintiff cannot certify a class under Rule 23(b)(2). Accordingly, Plaintiff's class allegations relating to Rule 23(b)(2) should be dismissed and/or stricken with prejudice.

**F. Class B should be stricken because it is duplicative of Class A.**

In the event that the Court finds that Plaintiff's proposed classes are not impermissible fail-safe classes, Class B is superfluous to Class A and should be stricken from the Complaint. As discussed on page 3, *supra*, in putative Class A, the members allegedly received calls to their

cellular phones by using an artificial or recorded voice despite not being A1 customers, and, in putative Class B, A1 either called a wrong or reassigned number or instructed A1 to stop placing calls to the number. (ECF No. 1 at ¶ 36.)

The issue here is consent. The District Court for the Western District of Kentucky in *Cabela's* addressed this issue and struck a superfluous class that attempted to distinguish between consumers who had never consented to receive calls and those who revoked their consent, as Plaintiff alleges here. *See Cabela's*, 2017 WL 4364205, at *8-10. Specifically, the Court found:

> Section 227(b) does not distinguish between consumers who have requested to stop receiving calls and consumers who never consented in the first place. Rather, the key distinction is between those who have consented and those who have not—the latter group consisting of both consumers who never consented and consumers who revoked their previous consent. Accordingly, Cabela's would be equally liable to those who have passively not consented to receive calls and to those who have taken affirmative steps to inform Cabela's they do not wish to receive calls.
>
> It is clear, then, that if Eldridge's "Stop" classes consist solely of those persons who have taken such affirmative steps, they are superfluous in light of Eldridge's "No Consent" classes. In other words, Cabela's had "no consent" from those persons who told it to stop calling them. If the facts are as Eldridge has alleged, these same individuals are already included in the "No Consent" classes. The "Stop" classes are therefore redundant and should be stricken.

*Cabela's*, 2017 WL 4364205, at *9-10 (citations omitted) (emphasis added).

So too here, Class B in Plaintiff's Complaint fails for the same reason that the plaintiff in *Cabela's* failed to distinguish between a proposed class whose members told Cabela's to "stop" calling their cellular telephone numbers and a proposed class for whom Cabela's never had consent to call. Therefore, for the foregoing reasons, Class B in Plaintiff's Complaint based on the dialing of a wrong number of the revocation of consent should be dismissed and/or stricken with prejudice. *See Cabela's*, 2017 WL 4364205, at *10 ("The 'Stop' classes are therefore

redundant and should be stricken. *See* Fed. R. Civ. P. 12(f). The Court will therefore strike from the complaint Eldridge's 'Stop' classes.").

**CONCLUSION**

Based on all of the foregoing, Plaintiff's individual claim for violation of the TCPA should be dismissed with prejudice under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, and Plaintiff's class allegations and claims should be stricken for failure to satisfy the requirements for class certification under Rule 23.

Dated: October 26, 2021

Respectfully submitted,

s/ Robert F. Tom

Robert F. Tom (TN #26636)
Zachary A. Kisber (TN #33388)
W. Preston Battle, IV (TN #35044)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ PC
First Horizon Building
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
Telephone: (901) 577-2159
Facsimile: (901) 577-0818
rtom@bakerdonelson.com
zkisber@bakerdonelson.com
pbattle@bakerdonelson.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 26th day of October, 2021, a true and exact copy of the foregoing has been served via the CM/ECF system which will send electronic notice to counsel of record registered with the CM/ECF system.

s/ Robert F. Tom